Illinois Appellate Court, 5th Division is now in session. The Honorable Justice Tobias W. Delores, aside. Please be seated. Good afternoon, everyone. Welcome to the Illinois Appellate Court v. District 5th Division. The clerk will call the case that's on the agenda for today. 1-22-0883, Waukegan Potawatami Casino v. Illinois Gaming Board. To begin, we're going to ask the attorneys who are going to argue to please step forward for a moment and introduce yourselves. Good afternoon. Your Honor, Dylan Smith for plaintiff appellant, Waukegan Potawatami Casino. Good afternoon, Christina Hansen, Assistant Attorney General on behalf of the Illinois Gaming Board, its Chairman, Members, and Administrator. Did you say you were Christina Hansen? Yes. I need you to speak about five levels higher when you step up, okay? Okay. All right, thank you. Good afternoon, Glenn Davis. I'm an attorney here on behalf of the City of Waukegan. Thank you. Counsel for the AG and the City, have you agreed how you're going to split time? Yes, equally, Your Honor. Equally, all right. We'll allow 20 minutes for each side with a five-minute rebuttal, so that means the City and the AG get about 10 minutes apiece. We tend to ask a lot of questions, so we'll probably go over that, but that's your guideline, all right? Very good, Your Honor. And Counsel for the Casino, you may proceed when ready. May it please the Court, Counsel, under the casino licensing regime established by the General Assembly, the Illinois Gaming Board does not have some general authority to issue casino licenses. Before the Gaming Board may issue a license for a casino, that license needs to have been specifically authorized by the General Assembly, and the Gaming Board needs to abide by restrictions and requirements that the legislature has imposed on the exercise of that authority. Now, we're here today because with the 2019 Gaming Expansion Law that amended the Gambling Act, the General Assembly authorized six new casino licenses, including for Waukegan. But the General Assembly specified that the Gaming Board could consider issuing those licenses only after, and I'm quoting from the statute, only after certain conditions had been satisfied. And in particular, among other things, the host community needed to certify that it had reached agreement with the applicant on certain key features of the casino. Now, is it your position that under the statute, the host city is not allowed to certify more than one applicant? Your Honor, we don't take that position, but if the city elected to certify more than one applicant, given the regime that the General Assembly put in place, which really puts a focus on upfront transparency and accountability by requiring these agreements ahead of time, the city didn't have the choice to say, which is what went on here, we're going to pass these on to the Gaming Board and then negotiate after the fact. So, we don't take the position that it couldn't be done, but as we allege in our complaint, what the city basically has conceded they did here was exactly what they're not permitted to do, which was to say, we're going to send these on to the Gaming Board, see who the presumptive licensee is, and then negotiate, quote, after the fact. Let me ask you, Tavira, for a second, some just housekeeping. Sure. What's the status of the federal case? It looks like there was a fully briefed motion for summary judgment and it hasn't been wrote on for a year. Is that still the status? That's still the case, Your Honor. So, in this case, the state courts are... If the federal case is resolved against you, what does that do to this case? I don't know that it really has an impact on this case. I would say the principal claim there can get into as much detail as you want, Judge, but those are essentially claims seeking monetary damages, first off. So, you still have the damages? To some extent. Go ahead. I don't think if it's resolved against us, it obviates this case, precisely because of the nature of the relief sought here. Let's say the city of Waukegan had, in fact, followed the statute, one of my favorite words, punctiliously, in past resolutions that unquestionably tipped every single dot in that statute, and then didn't select you. You know, you can't insist that they select you, right? It's their call. I think that's completely fair, Judge. I think that's completely right. And, you know, that is the essence of the claim here, that the city of Waukegan did not satisfy those preconditions. And one thing I want to be clear about, these are not just technical deviations from the statute. If you look at this, you know, this is not a game of, you know, gotcha for some technical violations. If you look at the statute, what it requires agreement on are some basic things, not just the location of the casino, but zoning, licensing, public health, other issues within the jurisdiction of the city. And what the city did here was to supply the gaming board, and I think this is important, with certifications that were deficient on their face. And, for example, and I know we've said this in our brief, when you look at the certifications, one of the tells, or if you're not a poker player, one of the giveaways, is that instead of just reciting the statutory language and saying, we certify that the city has reached agreement with the applicants on this statutory item, this statutory item, they stuck in the city has reached agreement, quote, in general terms. And that's not the only way the certifications were clearly deficient. When they said, toward the end of the certifications, which were attached to and incorporated in our complaint, by the way, when they said, oh, and here's where you can go find those agreements in general terms, the certifications just pointed to the proposals that the applicants had submitted in response to the request for proposals. Can I ask you about the trial court's ruling? Because as far as I can tell from the cryptic statement that we have in the record, I think the trial court was of the opinion that, well, that really doesn't matter, because you were voted down, you lost, so it's not mature. Yeah. I think that's right, Justice Mitchell. And I think the court did not elaborate at great length, but what I think the court essentially was saying is, look, you're in front of me asking me to enjoin the gaming board, right? What's at issue is what's happening at the gaming board level, and I don't see how that affects what happened in the city's certification process. And let me answer that, if I may, both with regard to the facts, the well-completed facts in the complaint, but also just the framework of the way this legislation works. And I'll start with the second point, because I think that's important. I don't think you can disentangle what happens at the gaming board from what happened at the city level the way the circuit court did, and I think that's really where the circuit court got off track on the standing analysis, because if you think about it, what is essentially supposed to be the end point of that casino review process at the city level, or the handoff, if you will, is the very certification that these things have occurred. And so that's, if the city is complying with the statute, that sort of defines the goalpost. And if you change that, if you deviate from the statute, you're not really giving people a lawful review process. And then what we have here, we would submit, is the gaming board turning a blind eye and enabling that. Now, that's the framework for this. And the cognizable legal interest here, and this gets to the heart of the standing matter, is the opportunity to participate in that lawful process. As a factual matter, in terms of what's alleged, and I think we do need to remember that this is a case that comes before the court on a dismissal at the pleading stage, but what happened here is it's not that WBC was weeded out at some earlier stage and then there was, you know, it had been narrowed to a few candidates and then the certifications happened. There were certifying, you know, I'm using air quotes around it, certifying resolutions that came before the city council where all four applicants who were still in play, including our client, were presented. And the problem is the process ended without the city having to really, by the admission of the then city attorney as is set forth in the complaint, there were effectively no negotiations with the applicants. There was no agreement on the statutorily required items, and thus there was no certification that that had happened. And that's a very different process. Counsel, is it your position that the city was required to then negotiate price, location, health and safety, zoning with each of the applicants before they then create the resolution that goes to the city council? Our contention is that before an applicant, or I should properly say a proposal, or proposals are quote, unquote, certified to the gaming board or what the certification requires is negotiation and agreement on those statutorily required items. So it's not a position that the city has to negotiate with everyone, but the process can't end until they have decided on some applicant or applicants negotiated and reached some agreement on those items. And this is not something, by the way, that we're just sort of making up to kind of torture, you know, a local government here and hold them to some unrealistic standard. If you look at exhibits 11 and 12 to our complaint, which are in the record obviously, it's in the appendix, those are the certifying resolutions and the host community agreement that the city of Rockford submitted to the gaming board. And that gives you a pretty good indication of the way this is supposed to look. I'm not saying that there's some obvious, you know, template for that, but the statute is pretty clear, I mean, by the general assembly standards. And I think it's also, I mean, those are enumerated items on which there has to be agreement. And what I would add about that to add some gloss to this, this licensing regime, section 75 for the six new casinos, and I think this does go to your question, Justice Lyle, it's a very different regime from what you have for the ten original casinos. So it's impossible to compare those two regimes and say there wasn't some deliberate choice on the part of the general assembly here to require some concreteness to these proposals. And let me give an example of something that actually the state and the city have brought up that points to the dilemma here, I think, in some respects, albeit unwittingly. I know we're going to get to mootness, so I'll kind of use that as a launching point. In the motion practice that's come before the court on mootness, both the city and the state have pointed out that at its June 15th meeting, the Gaming Board issued, or we would say purported to issue, a license for the Waukegan Casino. But there were two things that actually happened at that meeting. And this is acknowledged in paragraph five of the Gaming Board's brief, and it's acknowledged in Exhibit B, not their brief, I'm sorry, but their motion on mootness, and it's Exhibit B to the city's motion on mootness, which is a press release that the Gaming Board put out. The other action that occurred with respect to the Full House Resorts Casino is that the Gaming Board granted an additional year to operate under a temporary casino. So we're looking at, to the extent what happened on June 15th is relevant to mootness, the permanent casino, the thing that happened very recently is the permanent casino got pushed out an additional year into the future, February of 2026, which is relevant to the mootness thing, but it also shows the problem you've got here. You have a host community agreement, you've got some concrete agreement on construction, triggered by whatever it is, action by the Gaming Board, a certain number of months, a performance bomb, these are things. What you have now is, the city's stuck with Full House, they're going in front of the Gaming Board and making pretty material changes to what's going to be assumed. And the city and the state have invited you to watch that meeting, if you're so inclined, I urge you to, for the time windows that they've talked about in that meeting, because what was in Full House's proposal, which was attached to the certifying resolutions, the hotel, this great hotel they're building, will open up with the casino. They were asked about that at the Gaming Board meeting. I think this is around the 40-minute mark, but it's a citation in the city's brief. And the principal of the casino said, well, eh, maybe, right? So, this is exactly, exactly what the General Assembly, we would submit, was trying to avoid and what the statutes aim to avoid here. So, the core contention in WPC's complaint is precisely that, because the city did not satisfy these preconditions, which are spelled out in the statute, the Gaming Board just does not have the authority to issue a Waukegan license. And by moving forward, nevertheless, turning a blind eye, for whatever reason, to the city's noncompliance with those statutory requirements, it has enabled a process that actually turns on its head what the Gaming Board envisioned. Now, one thing that I think is important for this appeal, as the court considers the arguments that are going to be presented next, is that to the extent the city and the state moved under Section 2615 of the Code of Civil Procedure, they did not argue that the complaint below failed to make out noncompliance with the statute. To the extent they argued anything like failure to state a claim, it was based on the idea that WPC was not a proper plaintiff. And so, for purposes of this appeal, these procedural arguments about either why this case shouldn't be heard or why WPC isn't a proper plaintiff need to be taken on the assumption that the Gaming Board is, in fact, moving ahead in defiance of the will of the legislature. And wherever Your Honors come out on this case, that is troubling. That is troubling. And precisely for that reason, I think the circuit court's standing analysis was flawed, as is the argument that's been put forth by both the state and the city as to whether WPC has a right of action here. That issue, as we've pointed out, really leads to the intersection of two lines of cases, very well-established law. This is an action for declaratory and injunctive relief to compel an agency to comply with the law. This is not an action sounding in tort. And there's a long line of authority. You've seen it in the briefs. Noyola, Masterson, Clark. That says, in that type of case, you don't need to go through the traditional four-part analysis for deciding whether someone can point to a statute and use it as a source of the duty to assert a tort claim. Now, I will say that whatever framework the court uses, I think you get to the same place. Because this statute, as much as the city and the gaming board may argue otherwise, it is not just about economic development at all costs. Those may be the paramount pressures that come to bear, and that's speculation outside the record, but the statute strikes a balance between maintaining the integrity of the process and economic development. And when you look at the statutory regime I talked about with respect to the six new casinos and the level of procedural detail that's required with the two-stage involvement from the locality and the city, you can't say that the participants in the casino review process are not beneficiaries of this act. And in terms of whether there's a need to accomplish the purposes of the act, look at the gap that is potentially created if you affirm here. Right? You don't have to reach, you know, this is a dismissal at the pleading stage. We're assuming the gaming board is acting without authority. There is just an unacceptable gap if this action cannot be brought. There just is. You've got about two minutes left. Thank you. I'll just quickly, just to end on mootness, because I'm sure you'll hear about it, I've addressed it somewhat in terms of the time issue. I will say, to the extent the argument is being put forth that the fact that an agency has acted, taken very active in dispute, moots a case, that just can't be, that's not the law. It would certainly make our lives easier. There would be a lot of litigation, for sure. So that's not the law. But I think the city and the state, when you read their motions carefully, to be fair, I think what they're saying is, look, at a time when you filed your complaint, before the gaming board had acted, you were asking for an injunction. Your prayer for relief says this. Now circumstances have changed. We're going to hold you to your prayer for relief. That's not how Illinois pleading works. And we've set forth those cases in the brief, Civil Procedure Code 2617, 2604. This court, the circuit court, has the power to say that an agency that is acting without any authority has overstepped. And we've pleaded facts that entitle us to that relief. You don't take a formalistic approach to pleading and say, well, too bad, so sad. Events have moved past your complaint, especially when there's been a dismissal after one complaint at the pleading stage. So, in conclusion, I'd ask that you reverse the order of the circuit court, reject the alternative grounds for affirmance that have been advanced by the city and the state, and remand for further proceedings consistent with that ruling. Any other questions from the panel? Thank you. Thank you, Your Honor. Okay. Who's going up first for the appellees? Looks like the Attorney General. All right. Ms. Hanson, you may proceed when ready. Good afternoon. May it please the Court. I just want to start by pointing out that we are here, as counsel said, on a motion to dismiss. And so that means that the well-pleaded facts of the complaint are taken as true, but legal conclusions such that the board acted without authority or the certifications did not comply with the statute are legal conclusions that are not taken as true. Only the well-pleaded facts... Well, there's an allegation that the certification process was a sham and that it was designed and manipulated in such a way to reach a predetermined outcome, which is certainly alleged in the complaint. Is that a fact, or is that a legal conclusion? That's neither. That's not a well-pleaded fact because... Okay. It's not? Well, it's a factual allegation that would... Are you thinking that maybe it's not a well-pleaded fact because it's not specific enough? Yes. My point is that it's a legal conclusion to say that the certifications don't comply with the statute. So that's not... I mean, if you look at the complaint, which I did, if you look at paragraphs 35, 36, 37, it's not just a conclusion. I mean, there are actually exemplars given in each allegation with specific facts, right? I mean, I guess this is what I'm troubled by. We know that standing in state court in Illinois is a much narrower document than in federal court. And I just... I'm puzzled when I look at a trial court ruling that has no reference whatsoever to the allegations in the complaint. It has no reference to Illinois law related to standing. It just says I'm troubled by standing and therefore I'm going to dismiss the complaint. With prejudice. And then I go and read the complaint. What are we to make of this? I think it's important to put the allegations in the context of the statute here. And that Section 7E5 of the Act directs the board, this is an action against the board to enjoin the board from acting, and the statute directs the board to consider issuing the newly approved licenses only after the host municipality has certified certain things to the board. It gave the host municipalities sort of a gatekeeping function to initially select applicants that the board could then consider. And then the host municipality, the city here, would certify candidates, would certify applicants to the board. It could certify one, it could certify several applicants. If it certified more than one applicant, Section 7.12 of the Act directs the board to go through a competitive process to choose a final applicant. And so once the city presents those certifications, the board accepts those certifications and conducts its own licensing process. The licensing process of 7B of the Act as well as 7.5 and 7.12 of the Act is what the board does. And it's the board that makes the final licensing decision.  from the city setting forth that the city has negotiated certain things and is now ready and decided which applicants the board should consider. And speaking of the board, is there really some kind of administrative remedy that the Potawatomi could prevail itself of at the board at this point to obtain relief for the city's alleged failure to pass sufficient resolution? There's no because the planner was never an applicant before the board. The process was the process that the allegations of the complaint go to are the process that happened at the city. And then the city when the city certifies the applicants to the board, the board then has its own licensing process. All of the allegations and the complaint pertain to the city's process which is the subject of the plaintiff's federal lawsuit. The city tendered certifications to the board. And there's no dispute that the city tendered certifications to the board. And that triggered the board's I'm sorry? The dispute goes to whether or not the certifications were correct, whether they were accurate, whether the steps that were outlined that should have been taken were in fact taken. That's the dispute. Or do you think that's the dispute? Maybe I'm missing something. The dispute, their claim is that the board let jurisdiction to Because the city did not complete the certification part. But the certifications were submitted to the board. So what they're actually arguing is there is that the is about the way that the board exercised its What they're arguing I have a little disagreement. I think what they're arguing is that the steps that were enumerated that should have been followed were not. It certainly couldn't be your position that the board has the power to simply ignore the fair statutory requirements that the city is required to follow. Or is it? If the board chooses to bust the certification as flawed as it may be, that's the end of the story. Is that your position? The board accepts the certifications. They certify that these things have been that things have been negotiated, that the public meeting had occurred. Well, they certified sort of, right? They didn't They didn't They certified with some sort of generally We generally agree or something. Right? But I guess my question is more fundamental. Is your position I think this dovetails with what Justice Law says Is it your position that once the board accepts a certification, then regardless of how flawed that certification may have been before the city, it's just not subject to judicial review? Is that your position? The certifications were submitted and so what they're actually challenging is the way that the board exercised its statutory authority. The way that the board exercised. The board acted with certifications from the city that had not been invalidated at any point. And so the the board continued its process and it has a lengthy and detailed process for issuing licenses here. And that is that is the process that occurred and for that reason the claim here is moot. I think we're going to ask the same question. Okay. A case is moot when it's impossible for the court to grant effective relief. Isn't it possible here for the relief to be granted to be in the form of an order requiring the board to reverse vacate the license and the city to reconsider the resolutions and past resolutions certifying evidence under the standards and the stanchion which is essentially what they're arguing. Under Marion Hospital Court we don't think that that relief is available. There, like here the initial step of the process was to get a construction permit from the facilities planning board and then with that permit the entity could start constructing and become eligible for a license from the Department of Public Health. While the permit was being challenged the Department of Public Health the structure was completed and the Department of Public Health issued a license. And the court concluded that the case was moot because the license had been issued and so there was no there was no relief that could be granted. The license couldn't be invalidated because for that to happen the license would have to be revoked or non-renewed and the statutory provisions that governed whether whether a license could be revoked or reviewed didn't include looking back to whether there was a validly granted purpose. And I think that that's analogous to the situation here. The city submitted its certifications to the board. The board accepted those certifications and the board is now determining determining a final applicant and then also working towards that applicant obtaining license here. Two years. What is the purpose of issuing a temporary license if it becomes a permanent license? It's a license for the temporary facility. So they are fully licensed. Every step of There's no such thing as a temporary license. They're fully licensed once the board issues the license. Is that the position? They have a license to operate their temporary facility. The temporary facility, the building that they're building. The license is permanent once it's issued. The license is an owner's license and it's permanent for the next four years, yes. And I would note that to the extent that the case has been, to the extent that plaintiffs couldn't assert their claim, couldn't reach resolution due to the risk that the case would be mooted. They brought their action against the board two years after the certifications were accepted by the board and the board commenced operation. When the board issued the license here, like in Marion Hospital Court, it did so with certifications that had not been invalidated by any court or enjoined or otherwise suspect. When they sought temporary relief, they sought temporary relief to stop the finding of preliminary suitability, that was denied as unlikely to succeed on the merits and in turn they didn't seek to expedite this appeal or otherwise seek a resolution of the case that would have a resolution of their case come before the board issued the license. The statute itself contemplates that the licensing process would take about a year and obviously it's sensitive nature of the process is ongoing was present and for those reasons we think the case is moot and this court should not reach the merits but if the court does reach the merits, plaintiff does not have standing to assert this case because it was never an applicant before the board. It's seeking to enjoin the board's action but it has no standing to do so because it was eliminated at the city's level. They sort of conflate the process of selecting an applicant and certifying an applicant but at the end of the day enjoining the board doesn't give them the opportunity to be before the board because their proposal had already been voted down. They were never an applicant before the board so they are not substantially likely to be affected by a decision to that the board lacks jurisdiction in this case. For those reasons we ask that you affirm. Thank you. Good afternoon and once again I'm Glenn Davison here on behalf of the city of Waukegan and I  introduce the court to your wife who is seated over here who is the current corporation counsel for the city. The city of Waukegan is a large corporation and I would like to start by saying that the questions have been very illuminating as to where your thinking is and I want to try and respond to those as directly as I can. We agree that with the state's argument that this current case is really calling for an abstract hypothetical ruling. The final license has been granted but there was no material failure to comply with the statute. The Pottawatomie want to dictate the form of the resolution that has to be used. The Pottawatomie want to dictate the form and description of the agreement that has to be used. To listen to them you would think this was a scribbled note. This is an example of the resolutions that you'll find in the record. These track exactly the requirements of the statute on the terms that need to be covered by the statute. The resolution does in fact as Mr. Smith noted prefer that general agreements were reached. We don't agree with the Pottawatomie that you have to have specificity and every final detail and every zoning issue that's going to come up before you reach a final agreement and submit a certified party to the gaming board for consideration. That's not required by this statute. And it's unreasonable to read the statute to require such perfidiousness as I just said council, it's really what the case is about. It's whether or not those resolutions met the requirements of the statute or not. And in their position it seems to be that the city of Waukegan said, yeah, we're going to take these three companies, we generally agree they're all, whoever they were, Valley, Caesars, whatever, great, we love them, but they don't include how many square feet or what the building architecture is going to be or any of those other details that they seem to be saying are required by the statute, which seem to be, okay, taking their side, some things the city of Waukegan said, yeah,             but they don't include how many square feet or what the building architecture is going to be or any of those other details that seem to be saying are required    to be not required by the statute. So, what we have here is an agreement that is certified at the gaming board, very upfront that there are certain aspects of these agreements that are still going to be worked out. That's true with everyone. Rockford is an entirely different situation. It was one party to submit. So, simply negotiate an MOU and submit that. Here we have three different applicants, and the city was upfront from the beginning that we were going to consider multiple applicants and submit them, and everybody operated under the same rules as far as the certification process and going through the procedures, the long and the short  In fact, in 2019, we have 128 days to run a process to make a certification to the gaming board. You can criticize the city of Waukegan all you want, but they did their little best to come up with a fair process to get this through, and that's what happened. They came up with an application, they certified three parties they thought were best. Did they say in the end of their resolution that yeah, consistent with the Gaming Act that there's going to be a competitive bidding  gaming board level, these are the three we think would be satisfactory and suitable. That's all that was required of the city to come up with a fair process.   going to go into the specifics of this, but I do want to talk about the issues that are before the court today. The issue before the court today is whether or not this entity has standing at this point, or even an applied right of action to bring this suit. Judge Horan considered this case in not one but two separate arguments, and you have the transcripts of those arguments, the TRO hearing, and the motion to dismiss hearing. And I would encourage you to look at the record in the appendix at page 46 where she lists the arguments that were presented. It is extensively briefed here as to what the law is by both parties on standing, and made a determination that this particular party could not have standing because they would not have a cognizable injury at this point. They went through the same process to reach this point that the other suitable candidates went through to be forwarded to the Gaming Commission. They didn't make it. They can say all kinds of things about why they think they didn't make it, but they didn't make it. So at that point their rights are established. They don't really have procedural rights. And what they really are arguing about in their entirety are procedural rather than substantive rights. They concede that there is no right to receive a gaming license. They concede that there is no right to be passed along to the Gaming Board as a suitable candidate just because they filed an application. And it's interesting because in every case where there is no applied right of action, there's always going to be someone saying you didn't comply with the statute. That's always the case. But here we have a complete, comprehensive, statutory scheme which we think actually is exclusive jurisdiction for this type of issue as to decide whom is the appropriate party to provide a license for the game. And there is no precedent here. There was nothing to guide the city at this point in time as to how they should structure the process they went through. And they went through a very fair RFP process. Is there anything in the record that reveals why the city didn't certify Potawatomi but did certify the other three? Is there a particular deficiency? I think in the record are both parties summary judgment pleadings in the federal case and I think within those pleadings that kind of information is found. But yes, there were deficiencies and comparable things that were distinguishing to the city. That's another whole long factual story. Now, remember, the Potawatomi were voted on twice, not once, twice. They sought reconsideration and got reconsideration. But even before the board voted on reconsideration, the Potawatomi had already filed suits. And why is that? Actually, why didn't they do that two years earlier? In 2019, all of the facts concerning the situation, what the resolutions read, were there in front of everybody. They don't bring suit until 2021. And then they don't bring an injunction, they don't seek an injunction until later. First, they sued a state and the federal court case for damages and they didn't bring this suit. Many years later, really, if you look at the whole business, it's really almost four years that they've waited before they sought this relief that they're now seeking. You have two minutes left. I appreciate that time and I want to make sure that I answer all your questions. But again, I think the argument that the city, that Pottawatomie make really turns this whole resolution issue on its head because 230 ILCS 1075, the Gaming Act intends for the resolutions to ensure that the applicants have negotiated in good faith. It doesn't speak to the city and what its actions are at that point. The city is supposed to affirm that it has negotiated. What does negotiated mean? Facts, Law, Dictionary 2019, to communicate with another party for the purpose of reaching and understanding. There were meetings with all of the individual proponents of their applications, separate meetings, there were public hearings, there were meetings with  applicants, and they have pointed out how they believe the resolutions themselves, but again, what they are seeking now is relief that we throw out here in the earlier portion of the argument, we can simply order that we go back and throw out the certifications and make the city go back and do it all again. This is a two years worth of effort. There's been changed positions of parties here while the aiming board has done its deliberate process, going through who's been certified. That's always the case in litigation, though. Always the case? That's always the case in litigation. That millions of dollars in positions changed? Sure. Absolutely. Sure. But it doesn't lessen the impact on a community like Waukegan that's having. The public fist is involved. The public fist is at stake. It's not a private commercial dispute, really. We're not part of the class of people that were to be protected by the Aiming Act. That was the Illinois public. It was not  competitors.  Thank you, Mr. Davis. Thank you. And the appellant has five minutes for rebuttal. Just very briefly, Your Honor, because this is a difficult case. I know you've read the briefs, and I think many of the arguments that you've heard have been treated there. I would just say in response to what we just heard from counsel, it is not potawatomi trying to dictate what these certifications look like. It's in the statute plain as day. And it's not necessarily the most onerous requirements, but it's very clear not just that there needs to be negotiation, but there needs to be certification that there was agreement. And there's a reason the General Assembly did that. There has to be. And it makes a real difference if there are negotiations, and there's some agreement, some completeness on the basic points of the proposal. And if you don't have that, the whole process of vetting and deciding, well, these people will go on, is tainted. This case really is about the ability of the courts to vindicate the will of the legislature. Many of these arguments are arguments about, you know, close enough for government work. They don't really fly when you look at the resolutions and you look at the statute, but at best they're arguments to be made maybe down the road at summary judgment, maybe in a final disposition, but not at the pleading stage. They happen to be actually contrary to the well-supported allegations in the complaint because the statute was no agreement. We wanted to do multiple actions. We didn't think the statute could be followed. It wasn't up to the city of Waukegan to amend the General Assembly statute. When it became clear the board was going to act notwithstanding that, we brought a TLR. The gaming board took a pause to let them know    to act  that, we brought a TLR. The board took a pause to let them know that the board was going to act notwithstanding that, we brought a TLR. The board took a pause to let them    was  to  notwithstanding that, we    board took a pause to let them know that the board was going to act notwithstanding that, we brought a TLR. The board  a pause to let  know that the all took a pause to let them know that the board notwithstanding that, we              TLR. The board all took a pause to let them know that the board notwithstanding that, we TLR. The board all took